Johnson, J.
The history of our jurisprudence abundantly shows that the law merchant is, for the most part, made up of *358 ru^es originally framed and acted upon by the merchants for tjje£r own convenience and the benefit of trade, which, with the sanction of the Courts of justice, have become the settled jaw 0p tijo land, and as binding on the citizen as any other ruie 0f }aw • an¿ jt js from this source that the rules for the interpretation of mercantile contracts is principally derived. Every trade, art and profession, has a language in some degree peculiar to itself, and it is only by reference to the general understanding of those who are accustomed to use it, that we arrive at the meaning. For example, when a bill of exchange or promissory note is made payable on a certain day, one not conversant with mercantile usage would necessarily con-elude that it meant what was expressed, and that the acceptor of the bill or the drawer of the note, w’as bound to pay on the day specified, and it is only by reference to the under, standing and usage of merchants, that the days of grace are allowed in addition to all others. This process of law making is perhaps the most unexceptionable. A rule prescribed by the Legislature is necessarily arbitrary, and it is out of the question to expect that every possible case upon which it may operate could be anticipated. It is liable therefore sometimes to operate injuriously, and it is only tolerated because it is productive of the greater good. Rules formed by usage are the work of time, they must be understood and acted upon by common consent before they become binding, and the opposing interest of those upon whom they operate is a sure guaranty that they will not be permitted to operate unequally.
The introduction of new articles of commerce, and any new source of enterprise which is opened to the merchants, essentially different from those which have preceded, must give rise to customs and usages suited to their peculiar character ; and as there are none more interested than those immediately concerned in the particular trade to establish those that are reasonable in themselves and precisely suited to the occasion, there is no reason why they should not be at liberty to prescribe rules for its government. These, it is true,have not the force of law until they have received the sanction of the Courts of justice, and in that way become a part of the gen, eral law, but they are received as evidence and serve to ex. plain what was intended by the parties. Thus, though there be no express contract between the parties, yet it may be reasonably supposed that they meant to contract and deal according to the general usage, practice and understanding (if there be any thing peculiar) in relation to the subject matter. Savill v. Blanchard, 4 Esp. Ca. 53; Doug. 519.
To make a custombinding, three things only are necessary first, that it should be general, so much so as to be generally *359 known to those conversant with the particular trade; and that is not repelled by the ignorance of particular individuals, for every one will be presumed to be acquainted with the usages and practices of a trade in which he engages, Doug. 513. Nor will it be vitiated by particular instances of a departure from it. It is every day’s practice to pay notes and bills on the day on which they are made payable on their face, and no one ever thought that that deprived the payer of the days of grace if he thought proper to claim them. The second is, that it should be reasonable. On this subject judge Cheves says in Thomas v. O’Hara, 1 Const. Rep. 305, (by Mill) that “he is at a loss to conceive of any usage in relation to a particular traffic which may not be proved, unless it be so clearly and palpably unreasonable and unjust on the mere allegation of it as to be void;” and I take it that no usage can be considered as unreasonable, unless it is calculated to operate unequally and fraudulently. The third is that it must not violate any general rule of law.
With these general remarks, I will now proceed briefly to notice the evidence which was adduced on the trial.
Without descending to particulars, it will be sufficient to remark generally, that the facts established by the evidence on the part of the plaintiff, show that for thirty years past down to the present time, the general usage among the factors is, that when cotton arrives at the wharf, dry and in good order, it is immediately weighed at the public scales, and the weight marked on each bag, and entered in the scale book, and if not then sold, is put in store. If not dry and in good order, it is exposed for the purpose of drying, and when in the judgement of the wharfinger it is sufficiently dried, it is then weighed and stored in like manner. That generally there is a loss in weight during the time it is in store, arising from evaporation, depending in quantity upon the time it remains in store and the part of the warehouse in which it is stored; that in the garret immediately under the tiles losing more, and that on the ground floor less ; and some instances were stated in which that stored on the ground floor had gained instead of lost — that the usual loss of weight from this cause is four or five pounds to the bag, but when it is picked out of the field and packed early in the season, a loss of ten pounds per Bale would not be thought extraordinary; and the witnesses for the plaintiff, including some of the most respectable and experienced factors in the city, all- concur in saying that sales are generally made with reference to the weights entered on the scale-book, and that the bills of parcels are made out from the entry on that book. Mr. Robinson, who had been engaged in the trade for thirty years, Mr. Magrath, who had been engaged for *360 twenty-five years, and Mr. Ker Boyce, who had been engaged tra(je for seventeen years, and indeed all the witnesses for t[je plaintiff, concur in saying that it was a rule generally acje(j Upori) an(j one from which they had never departed, except it was expressly stipulated for in the contract of sale.
On the part of the defendant, a number of witnesses of equal respectability and experience have testified against the custom: but upon analyzing this evidence, I think it will be found that their evidence consists rather of deductions as to the equity of the custom, than the fact of its non-existence. . I will take for example the evidence of Mr. Calder, who is engaged in buying cotton. He says that it is a matter of mutual convenience to take cotton at the first weight, but he considers that the purchaser has a right, if he has any reason to suspect that the weight will not hold out, to ascertain the actual quantity, by weighing at the time of the delivery, or at any time before it is taken from the wharf. In several instances he has required cotton to be re-weighed, and the factor has made no difficulty, and in his opinion if the buyer requires he has the right to re-weigh. Now this appears to me to be, so .far as the fact is concerned, proof that the general habit is to take the cotton at the original weight, but that buyers occasionally require it to be re-weighed, and it is submitted to, by the factors. So of the evidence of Mr. Adgér, another witness on behalf of defendant, who has had great experience, both as a factor and buyer of cotton. He states that the practice of weighing cotton before it was put in store, first originated in engagements to pay the freight on cotton by weight, and it was necessary to weigh it when received, to ascertain the amount of freight. That although cotton now pays freight by the bale, and that necessity no longer exists, yet the habit of weighing prior to storing has been continued for the convenience of the wharfinger. The difficulties in relation to this matter have induced this witness to instruct his wharfinger not to weigh his cotton until it is sold, and in his judgement the buyer has a right to as many pounds as he pays for, and that there is no custom which prevents the purchaser from ascertaining the weight. Now, as I understand this witness, he too proves that the general usage still is to weigh the cotton before it is stored, to which his own practice is an exception, perhaps a solitary one ; and that the purchasers are generally content to buy according to these weights ; but according to his view of justice and morality, the purchaser ought to pay for no more than he has received.
I think, therefore, that the fact of the existence of the general custom, was one which, under the circumstances, fell most peculiarly within the province of the jury, and unless their conclusion was in opposition to the decided preponderance of *361 the evidence, it ought to be decisive ; and so far from this being the case, it strikes me as being in accordance with it; and I am equally well satisfied with the reasonableness of the custom. Upon a superficial view of the matter, one would very readily fall into the opinion entertained by the witnesses on behalf of the defendant, that it was unreasonable and unjust that a purchaser, contracting to pay so much by the pound weight, should be required to pay for a greater number of pounds than he received ; but the legal presumption is, that any one who embarks in a particular trade, is acquainted with the nature of the article in which he deals, and the general usages of those who deal in it. We must then suppose that the defendant knew, at the time he made the contract, that cotton, when put in store, would generally lose in weight, depending for the quantum of the loss upon the part of the house in which it was stored, the season of the year in which it was picked and packed, and the time that it was in store ; and that the general usage was to sell by the weight ascertained when it was stored, and /rom these data, which he might ascertain, he would be able to form a pretty correct estimate of the amount of the loss in weight. This would necessarily enter into the estimate of his offer to purchase, and it is his own fault if he makes an inconsiderate offer, for he is under no obligation to give what the seller may demand. This, too, is a view of one side of the case only. The seller has rights as well as the buyer. He also is presumed to know that cotton will lose in weight when in store, and that the scale house weights generally represent the quantity as greater than would be found upon weighing; and it may well be supposed that he has on that account submitted to take less than he would have done if the precise weight had been before ascertained, and it would do injustice to him if he was compelled to submit to the loss which would be the probable result of weighing. This mode of ascertaining the quantity of an article of commerce is not peculiar to cotton. Flour, for instance, is habitually sold by the barrel, without stipulating that it shall contain a given number of pounds, and yet every one understands that it must contain 196 pounds, because it is the usage to put that quantity in each bariel. The quantity of cloth or other goods, sold by the piece or package, is generally, nay almost universally, ascertained by the quantity stamped upon them, and it rarely occurs that the precise quantity is marked, and'it never yet occurred to any one that if there should happen to be a fraction over, that the buyer should pay for it, or if a fraction under, the seller should make it good; and so of very many other articles which might be enumerated.
I think, too, that the proof establishes that the usage is for *362 ^le C0nvenienCQ °f persons engaged in the trade, and ope» rates as a benefit. When the trade is brisk, it is said that the same parcel of cotton sometimes passes through several hands in a short space of time, each seller calculating on a small pyogt, and sometimes submitting to loss; and if each buyer might, at his pleasure, demand that it should be re-weighed, it is apparent that besides the loss of time, the expenses must so diminish the profit or increase the loss, as to put an end to this sort of traffic.
The interest which this case has excited, has given to it some importance, and as establishing a rule for the construction of these contracts, it deserves the consideration which has been bestowed upon it; but it belongs to that class of cases in which the parties have the right to make the laws of their own contracts, and whether the verdict of the jury, or our view of the facts and the law, be right or not, the community can suffer no injury. The buyer has the right to stipulate that the cotton shall be re-weighed, unless he is satisfied to take it at the wharfinger’s weights.
The usage, as proved, is understood to extend only to the loss of weight from natural causes, and not to such as arise from mistakes and frauds. There the seller would certainly be bound to make good, and it does strike mo that the high average loss upon this cotton raises a pretty strong presump, tion that the loss here might, at least in part, have arisen from the presence of water which was unobserved at the time it was weighed and stored, and which has subsequently evaporated ; but that, too, was a question for the jury, who were no doubt more competent to judge of it than the Court.
The motion must therefore be dismissed.
Harper, J. concurred.
O’Nealr, J. absent.